IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

---------------------------------------------------------

WANDA GRIGSBY,

                                    PLAINTIFF,

VS.              NO. 4:19-cv-00778-LPR

PULASKI COUNTY SPECIAL SCHOOL DISTRICT,

                                  DEFENDANT.

---------------------------------------------------------

---o---

DEPOSITION

OF

WANDA GRIGSBY

---o---

FRIDAY, FEBRUARY 19, 2021

---o---

PLAINTIFF'S EXHIBIT
A
tabbies

1    A    I graduated from Hall High, 1985.

2    Q    And I asked about your relatives in the, you

3    know, the Eastern District, which is several counties

4    surrounding Pulaski, and you have listed these four

5    relatives.  We need to add Kyler to the list, as well;

6    correct?

7    A    Yes, sir.  I had them listed as daughter and son

8    on that.  So, yes, sir.  Yes.

9    Q    No, I'm not saying you did anything wrong.

10   A    Okay.

11   Q    I'm just making sure, for my records.

12   A    All right.

13   Q    So, Gwen, who lives with you, is your sister.

14   And who is Mr. Gregory Lewis?

15   A    My brother.

16   Q    Your maiden name is Lewis?

17   A    Yes.

18   Q    And this is Malika Austin?

19   A    Yes.

20              MR. PORTER:  Malika.

21              THE WITNESS:  Malika, yes.

22   BY MR. KEES:

23   Q    And what is your relation to her?

24   A    She's my sister.

25   Q    Sister?

Page 13

1   Q   And you went to UALR and graduated in '90 with a

2   Bachelors degree in criminal justice?

3   A   Yes.

4   Q   And then, you obtained some type of license

5   through the Academy of Private Investigations and

6   Protection -- Professional Inspection Services?

7   A   Yes.

8   Q   Where is that academy?

9   A   At that particular time, I don't know if they are

10  still located there, but they were off of Market

11  Street in Little Rock.

12  Q   What do you get when -- what kind of license do

13  they provide?

14  A   Private investigators license.  Basically, you

15  get the certification, you get the hours, the

16  education to go -- to move forward to the State Police

17  to take the exam.

18  Q   So, you are -- at least in May of 2002, you were

19  a licensed private eye?

20  A   Yes.  I received my license, yes.

21  Q   And do you still have that license?

22  A   I do not currently.

23  Q   Okay.

24  A   I didn't pay to have it -- I haven't had it

25  renewed.

Page 15

1    no longer have that inspections license.  That was

2    with the Department of Human Services and with Code

3    Enforcement.  So, I no longer have that.

4    Q    What is that inspection license?

5    A    That inspection license gave me the right to

6    going into jails and all, making sure that the jails

7    were facilitated for juveniles, that you were not

8    holding juveniles along with adults in adult

9    facilities.

10   Q    Okay.  And DHS provided that license?

11   A    Yes, sir.

12   Q    So, you have an interest in criminal justice, I

13   presume?

14   A    I did, yes, sir.

15   Q    Okay.  And has that just always been an interest

16   that you have had?

17   A    Yes.

18   Q    And you came to work for the district, was it

19   2012, I believe?

20   A    Yes, I believe that's correct.  Yes, sir.

21   Q    Give me kind of a summary of your work history

22   from '90 when you graduated UALR up until 2012 with

23   the district.

24   A    Okay.

25   Q    And I don't need perfection, I just kind of want

Page 18

1          MR. KEES:  It's 16 pages.  And it has --
2     well, it has the IRS documents attached.
3          MR. PORTER:  Okay.
4          MR. KEES:  And that is an IRS and H&R
5     Block.
6          THE WITNESS:  Okay.
7          MR. KEES:  Yes.  And there is your
8     signature.
9          MR. PORTER:  Yes.
10          THE WITNESS:  We did the resume.
11          MR. KEES:  Well, it just didn't -- it's
12     no big deal.
13          MR. PORTER:  Let me see something, Cody,
14     a second.  I'm sorry.  I don't know if I have
15     one that is in this stuff here.  All right.
16     That's my fault.  I don't know what happened.
17     I thought we got that to you.  Okay.  I
18     apologize about that.
19          MR. KEES:  No, you are fine.  Yes, if
20     you don't mind, send me one.
21     BY MR. KEES:
22     Q    Let me ask you about your Workers Comp claim.
23     Let's talk about the 2017 claim that you listed.  And
24     I understand this is where a physical therapy dummy
25     fell, injuring your right arm and shoulder?

22e95b38-ac8d-4538-b810-5e0f1236d0ce

Page 20

1    problems with my arm.  And I didn't have any other way

2    of getting help for it.  So, I filed for that then.

3    Q    Did Mr. White represent you?

4    A    No.  I started with -- I think it was Buckalew.

5    I think that was the attorney's name.

6    Q    So, the May 2017, did you ever miss work?

7    A    Yes, I did.

8    Q    And when do you think your surgery was?

9    A    It was -- I had the accident, I think, in May or

10   June.  My surgery was November of that year.

11   Q    Of '17?

12   A    Yes.

13   Q    So, were you off work that entire time, from the

14   injury to the surgery?

15   A    No, I was not.

16   Q    Okay.  And then, you had the surgery.  At that

17   point, was it a contested claim or accepted claim when

18   you had the injury?

19   A    It was an accepted claim, I believe it was.

20   Q    Okay.  So, they paid the surgery, the Workers

21   Comp insurance?

22   A    Yes, yes.

23   Q    And then, after that surgery, in roughly November

24   of '17, something caused you, then, to need to file a

25   claim?

1    right here, this January 15th of 2020?

2    A    Yes.

3    Q    Okay.  All right.  So, last date of service,

4    January 15, 2020.  That's your signature right -- do

5    you see my mouse?

6    A    Yes, I do.

7    Q    I think there is a way for me to annotate this.

8    That's not really what I was wanting to do.  But you

9    can see it there.  That's your signature?

10   A    Yes.

11   Q    Okay.  And then, it says, "Disability required

12   due to ongoing Workers' Compensation claim"?

13   A    Yes, sir.

14   Q    And I'm assuming that was related to the right

15   arm and shoulder injury and inability to continue the

16   job?

17   A    Yes.

18   Q    Are you currently receiving disability?  Not

19   Workers Comp, but actual disability of some sort?

20   A    Long-term is what I'm receiving.

21   Q    Long-term?

22   A    Up under the district, I guess, or private, yes.

23   Q    You are saying like your AFLAC insurance program

24   that you had through the district?

25   A    Yes.  It's whatever that insurance is with them.

1   A    Yes.

2   Q    So, let's go back, and just the grievance issue

3   through the PCSSD --

4   A    Right.

5   Q    -- did that come to a resolution?

6   A    Eventually, it did.  The disconnect that I had,

7   Bennie Bowers was still there.  I did not feel safe,

8   because even going to Mr. Brewer at that time, he was

9   -- I was still having to be in the same office with

10  him at that time.  And that's why I went on forward

11  with the EEOC.

12  Q    Okay.

13  A    Okay?

14  Q    Yes.  And then, the EEOC went to mediation, and

15  ultimately it was resolved by way of an agreement?

16  A    Yes, sir.  And in that time frame, they did get

17  rid of Bennie Bowers.

18  Q    Okay.

19  A    They did have him resign.

20  Q    And how did you feel about that?

21  A    I felt better that he had resigned, but I did not

22  feel better in the aspects of Dave Thomas being there.

23  Because they were best buddies, and I knew that that

24  was going to -- you know, that was another thing

25  there.

Page 39

1    Q    Yes.  And we will get to that.

2    A    All right.

3    Q    Let me make sure -- let me make sure our time

4    line is -- so, you are hired in August of 2012;

5    correct?

6    A    Yes, sir, if that's what it is.

7    Q    And what's your position when you were hired?

8    A    I went from a security officer to a training

9    officer to an administrative sergeant.

10   Q    So, you start as a, what, training -- what did

11   you start at?

12   A    When I first was hired on at PCSSD, I was a

13   security officer.

14   Q    And that's an individual that patrols buildings

15   and campuses?

16   A    In the schools, correct.

17   Q    All right.  And what's your next lateral move?

18   A    Training officer.

19   Q    And what is the difference?

20   A    Training officer, I did all the training for the

21   district, such as active shooter.  I did training such

22   as -- when I got hurt, I did the PT training of it,

23   physical training.  I did seminar training.  Anything

24   dealing with the students' safety.  Those were in my

25   job duties.

1   Q    As a training officer, do you still perform

2   security officer duties when not training?

3   A    Basically, I supervised them, is what I did.

4   Q    Okay.

5   A    Okay.

6   Q    So, as a training officer, you provided training,

7   but you also become a supervisor to other security

8   officers?

9   A    That is correct, yes.

10   Q    Okay.  So, in the hierarchy, is the security

11   officer the entry position in the Security Department?

12   A    Yes.

13   Q    And is the next position a training officer?

14   A    Yes.  I would say you could say that.

15   Q    Okay.  Are you having trouble hearing me?  I know

16   you lean close every time I talk.

17   A    Yeah.  It's kind of muffled.  It will be clear

18   and then it's kind of muffled.

19   Q    What about now, is that better?

20   A    That's better.

21   Q    Okay.  I will do my head set.

22   A    All right.

23   Q    So, training officer.  And then, what was your

24   next move after training officer?

25   A    Administrative sergeant.

Page 41

1    Q    All right.  And is that the next -- I know that

2    was your next move.  But in the hierarchy, is that

3    right above a training officer?

4    A    Well, actually, no.  It was actually a step

5    below.  The training officer would have been higher

6    than an administrative sergeant.  During that time

7    frame, what occurred was, they did some salary cuts.

8    And so, what happened was, I got kicked down from a

9    training officer at $70,000.00 to an administrative

10   sergeant at $50,000.00.

11   Q    What year was that?

12   A    2017, 2018, maybe.

13   Q    Did they eliminate all training officers?

14   A    Yes.  I'm the only one that had that position.

15   Q    Oh, you were the only training officer in the

16   district?

17   A    Yes, that was in the district, that is correct.

18   Q    So, they eliminated your position, and then

19   offered you an administrative sergeant position?

20   A    Yes.

21   Q    And then, who took over training

22   responsibilities?

23   A    That was up under me, as well.  They just

24   eliminated the training officer's position.

25   Q    Okay.  Well, you told me earlier that you were a

1   Q    That year, this 2017-'18 when you took the

2   administrative sergeant, who did you report to?

3   A    Bennie Bowers, initially, until it was over.

4   Okay?

5   Q    Until he resigned?

6   A    Yes.

7   Q    And then, Dave Thomas?

8   A    Correct.

9   Q    And they were both directors?

10   A    Dave Thomas was the captain, and Gerald Tatum,

11   they had the subtitle of captain.  But if you said who

12   was I supposed to report to, it was Bennie Bowers.  By

13   the paperwork, it was Bennie Bowers.  After that, you

14   know, that's what we had of the -- as I stated before,

15   I was going through the grievance process and all.  As

16   things completely changed there, I think Paul Brewer

17   took over that until he could get a director, who

18   later, you know, became Curtis Johnson.  That's how it

19   was then.

20   Q    The complaints about Bennie Bowers when they

21   started, were you in the role as administrative

22   sergeant?

23   A    I was in the role of, I can't remember, training

24   officer or administrative sergeant, if you have that

25   documentation.  Administrative sergeant, you are

1   correct, administrative sergeant.

2   Q    Yes.  Because the first -- in some of the

3   documents I show, you make a complaint that Mr. Bowers

4   laughed about a name plate.  Do you remember that?

5   A    Yes, sir.

6   Q    And that's October of 2017.  And you are also

7   discussing PSO certification.  So, would that be when

8   you are in the administrative sergeant position?

9   A    I would have been -- in 2017, I believe I would

10  have been -- I don't know if I was a training officer.

11  Q    Oh, okay.

12  A    It was -- my position as a training officer --

13  protocol would have been, again, I think, June -- it

14  would have changed out in that June of that year, if

15  I'm not mistaken.

16  Q    June of what year?

17  A    I think it may have been -- if we did the school

18  term of June, it would have ended June of 2017, maybe,

19  if I'm saying it correctly, it would have been then.

20  Q    And then, that means July 1 of 2017, you would

21  have become the administrative sergeant?

22  A    That is correct.

23  Q    So, this entry that you are reading about the

24  name plate, if that's in October of 2017, is that when

25  you are the administrative sergeant?

1    A    In October of 2017, yes.

2    Q    Okay.  And I'm reading from the chronology that

3    you provided.  And the first date is May 2017, and

4    your issue with Mr. Bowers, I'm just summarizing --

5    A    Okay.

6    Q    -- was that he became increasing difficult in his

7    dealings with you after your Work Comp accident.  Now,

8    May of 2017 you would have still been the trainer?

9    A    Yes.

10   Q    Okay.  And then, after July 1 of 2017, any issues

11   with Mr. Bowers were in your role as administrative

12   sergeant?

13   A    Yes.

14   Q    Okay.  And then, we saw earlier that you

15   resigned, what was that, January of 2020?

16   A    Yes.

17   Q    Okay.  So, my question is, starting in July 1 of

18   2017, when you became an administrative sergeant, was

19   that the position you remained in until your

20   resignation?

21   A    Yes.

22   Q    So, 2017-2018, 2018-'19, that school year, you

23   were administrative sergeant?

24   A    Yes.

25   Q    And 2019-2020, you were an administrative

1    sergeant; correct?

2    A    Yes.

3    Q    And then, one semester of the '20-'21 school

4    year, essentially July until your resignation in

5    January of 2020?

6    A    Yes.

7    Q    No.  I take that back.  The '19-'20 school year

8    was the year you resigned; right?

9    A    Correct.  You are correct.

10   Q    All right.  So, help me flesh out, then, the

11   '17-'18 school year, when you become an administrative

12   sergeant, the facilitator positions are opened?

13   A    Okay.  The facilitator position came open, again,

14   as I stated, after Mr. Bowers was removed.  It came

15   open around -- maybe June or July, it was coming up,

16   because as I stated, those -- the captain positions

17   were being RIFed.

18   Q    Okay.  So, the facilitator positions, did you

19   ever have an opportunity to apply for those positions?

20   A    Yes, sir, I applied.  Prior to me applying, Mr.

21   Brewer had me in that role, along with Curtis Johnson.

22   I was the only one -- after those positions were gone,

23   then I would have been the next in charge, because I

24   was the only one in administration.

25   Q    Okay.

Page 50

1   A    So, I sat in that role for that period of time.

2   Q    Until when?

3   A    Until they announced on August 30th that Dave

4   Thomas was the facilitator of the position.

5   Q    August 30th of when?

6   A    2018-2019.  Whatever is on that --

7            MR. PORTER:  2018.

8            THE WITNESS:  2018.  Thank you.

9   BY MR. KEES:

10  Q    And at that point, there is no director, there is

11  just a facilitator?

12  A    Yes.

13  Q    And he reports directly to Curtis Johnson?

14  A    Yes.

15  Q    So, Mr. Bowers, I don't have the exact date, but

16  it was sometime in the spring of 2018 -- let me ask

17  you this.  Your Complaint shows that you filed the

18  sexual harassment charge against Bennie Bowers and it

19  was resolved in June of 2018.

20  A    Yes, sir.

21  Q    And when it was first resolved, he was still

22  employed there at PCSSD?

23  A    Yes.  What I'm saying is, they didn't resolve it

24  until then.  When I made the grievance back in, I

25  believe it was April, he was still there.

1    Q    Okay.  So, sometime after April of 2018 and

2    before June of 2018, he resigned?

3    A    Yes, sir.

4    Q    Okay.  And the facilitator position was filled by

5    Dave Thomas and the director was not filled?

6    A    Yes, sir, that's correct.

7    Q    Okay.  So, in the roughly year that you were the

8    administrative sergeant from, you know, July 1 of 2017

9    up until the summer of 2018, the facilitator

10   positions, was anybody sitting in those?

11   A    No, no.  The facilitator position just, like I

12   say, it didn't come up until those two positions were

13   RIFed.  There was never even any talk prior to the

14   other positions being RIFed.

15   Q    You are talking about the captain?

16   A    Correct.

17   Q    Which was Dave Thomas?

18   A    And Gerald Tatum, yes, sir.

19   Q    What happened -- is it Ms. Tatum, Joe or Jill?

20   A    Gerald Tatum.

21   Q    Gerald Tatum?

22   A    Yes, sir.

23   Q    Where did he go after he was RIFed?

24   A    Unbeknownst to me, all I can actually honestly

25   tell you is that Mr. Brewer had shared that I would be

1   over -- I would be handling the affairs in the

2   department, I currently had the position.  I didn't

3   even know that he had hired Dave Thomas or Gerald

4   Tatum.  I didn't know that until they appeared and

5   came to work one day.  I didn't even have a clue that

6   that was even there.  So, that's all I can answer you

7   about that, in all honesty.

8   Q   Okay.  And you are talking about temporary

9   workers after they were RIFed in June 30th of 2018?

10  A   Yes, yes.

11  Q   So, you took over as administrative sergeant in

12  July 1 of 2017, there are no facilitators, but you

13  have two captains, Tatum and Thomas, and a director in

14  Mr. Bowers?

15  A   Yes.

16  Q   And I'm talking about July of 2017.

17  A   Right, July of 2017.

18  Q   Yes.  And then, the two captain positions are

19  RIFed at the end of -- in or around April or May of

20  2018; correct?

21  A   Yes.

22  Q   And you are alleging that Mr. Thomas and Mr.

23  Tatum came back as part-time employees in the summer

24  of 2018?

25  A   Yes.

Page 53

1    Q    Okay.  And then, Mr. Thomas was then named as the

2    facilitator in August of 2018?

3    A    Yes, I am.

4    Q    And after that, did we ever hear from Mr. Tatum

5    again?

6    A    Yes.  Mr. Johnson placed Mr. Tatum as a security

7    officer at Daisy Bates Elementary.

8    Q    Okay.  Presumably with less pay, or do you know?

9    A    He wasn't a part-time, he was a permanent

10   security officer.

11   Q    Okay.

12   A    You know, there is a difference in temporary and

13   permanent.  He was a permanent security officer.  So,

14   yes, that would have been less pay.

15   Q    Okay.  What is Bennie Bowers' race?

16   A    He's a black male.

17   Q    Black male.  Okay.  So, you never formally

18   applied for any position as a facilitator, captain, or

19   director?

20   A    Yes, I applied for the facilitator's position,

21   yes, sir.

22   Q    Oh, you did?

23   A    Yes, I said I did.

24   Q    You did?

25   A    Yes.

1   Q     Are you referring to when Dave Thomas was given

2   the job?

3   A     Yes.  It was supposed to be two positions, and

4   they did not fill two positions.  When I asked Mr.

5   Brewer about it, he -- his response to me was, "They

6   were going to hire two."  But when I asked them -- you

7   know, I applied and all.  And then, when I went back,

8   because they were not saying anything about who had

9   gotten the position after we interviewed or anything,

10  Mr. Brewer's response to me was, "Well, your arm is

11  messed up, anyway.  So, you know, you're not" -- you

12  know, I wasn't going to get it.  And so, I didn't say

13  anything, I just looked.  But they hired only one,

14  rather than two.  That announcement came in a meeting

15  with Curtis Johnson, in one of our meetings that we

16  would hold with the security officers, and he said

17  that Dave was now the facilitator.  And when we asked,

18  "What about the other position," and did they say how

19  was it, you know, scaled or rated, because nobody got

20  letters stating that they, you know, did not receive

21  the position or anything, he said, well, he was just

22  announcing that Dave got the position.

23  Q     At that time, did the department already know

24  that there were not going to be any -- there was not

25  going to be a director or any captains?

Page 55

1   A     Yes, yes.  Yes, we knew that.

2   Q     And so, you knew that they were restructuring to

3   create at least two --

4   A     Facilitators, yes.

5   Q     Okay.  So, like pre-2017, did the district really

6   have an administrative sergeant, facilitator,

7   captains, and a director?

8   A     You said pre-2017?

9   Q     Right.  Before -- yes.

10  A     Okay.  They had -- they had two supervisors --

11  they gave the name.  Bear with me.  They gave the name

12  "captains", but they had two supervisors and they had

13  a director, is what they had, and you had your

14  security officers.

15  Q     So, it was structured differently?

16  A     Yes.

17  Q     Okay.  After Mr. Bowers resigned in the spring

18  and summer of 2018, did you ever hear from him again?

19  A     No.

20  Q     You don't know where he is or anything about him?

21  A     I do not.

22  Q     Okay.  And I'm going to try to pull up the date

23  that you filed your first EEOC charge against -- okay.

24  December of 2018.  No, that's your second one.  I've

25  got them here.  Give me a second.

1   A    Okay.

2   Q    I'm having to try to not go back to my computer

3   so it doesn't make that terrible noise.

4   A    That's all right.

5   Q    So give me a second to try to find my paper

6   documents.

7   A    That's all right.

8                  (WHEREUPON, a break was taken.)

9   BY MR. KEES:

10  Q    I wanted to show you, Ms. Grigsby -- and I got my

11  program to work now.  Is this your first EEOC charge

12  which you signed on 4-3 of 2018?

13  A    Yes.

14  Q    Okay.  And this was the one related to issues

15  with Bennie Bowers; correct?

16  A    Yes.

17  Q    And then, this is the one that you went to

18  mediation on?

19  A    Yes.

20  Q    And do you remember signing a Settlement

21  Agreement?

22  A    Yes, I did.

23  Q    And I think you received monetary payment and

24  some days off?

25  A    Yes.

Page 57

1    Q    Okay.  So, the Settlement Agreement, which I have

2    here, and I don't want to get into the substance, I

3    just want to look at the date.

4    A    Okay.

5    Q    You signed it on the 19th of June?

6    A    Yes.

7    Q    My question was going to be, between the filing

8    of the Complaint in April and then when this was

9    signed the 19th of June, do you remember if Mr. Bowers

10   had resigned prior to you signing the agreement?

11   A    Yes, he had.

12   Q    Okay.  When you made the -- when you signed your

13   charge -- when you signed your charge right here, what

14   is that date there?

15                    MR. PORTER:  December 2018.

16                    MR. KEES:  Yes.

17                    MR. PORTER:  December 20 of 2018.

18                    MR. KEES:  Yes.  I'm sorry.  Let me go

19         to the -- I've got two here.

20   BY MR. KEES:

21   Q    The first one is the one I wanted to look at.

22   Right here, when you signed your charge on April 3rd

23   of 2018 --

24   A    Yes, sir.

25   Q    -- do you remember if he was still employed at

Page 58

1    this time, Mr. Bowers?

2    A    I want to say that he was.  I'm uncertain, but I

3    want to say that he was.

4    Q    Okay.

5    A    I'm uncertain.

6    Q    And then, after that date, did you have any more

7    interactions with Mr. Bowers, after this date of 4-3,

8    2018?

9    A    Yes, I believe I did.  I think I -- bear with me.

10   As I stated, I think what transpired, I went to EEOC,

11   because, like I said, at that time Mr. Bowers was

12   still there.  After those things transpired, I had

13   issues until I became the -- I mean, after

14   administrative sergeant.  So, I think he -- I don't

15   remember the month that he left, is what I'm uncertain

16   about.

17   Q    All right.  We will nail that down.

18   A    Okay.

19   Q    My main question was, when you had resolved that

20   EEOC charge in the summer of 2018, he had resigned?

21   A    Oh, yes, he had resigned then, yes.

22   Q    All right.  And then, let's pull up your second

23   charge, which I'm giving to you on the screen right

24   now.  And it's the charge that you are suing under,

25   and it's dated -- do you see the date there?  I will

1    highlight it for you.

2    A    Okay.

3    Q    It's dated right here, 12-20, 2018.

4    A    I don't see it.  But okay.

5    Q    Right here.

6    A    I don't see it.  I see 8-30 -- 20 -- 2018, is

7    what I see.  Oh, down at the bottom.  I see it now.

8    Q    Digitally.

9    A    Oh, okay.  I see it now.

10   Q    And let me just read it.  I'm not going to make

11   it part of the record.  It's in the record, so I won't

12   attach it.  I just want to make sure, I just want to

13   talk about it a little bit.  So, you were hired in

14   August 2012, and your position was administrative

15   sergeant at the time of this charge; correct?

16   A    Yes.

17   Q    And you write that you applied for a facilitator

18   position about May of 2018; correct?

19   A    Yes.

20   Q    And that's -- and again, as we discussed earlier,

21   in or about May of 2018 you were under the impression

22   that there would be two facilitator positions filled?

23   A    Yes.

24   Q    And at that time, my understanding, in talking

25   with you, that position -- those positions were open?

1    A    Yes.

2    Q    Okay.  And there were two captains that we have

3    discussed, Mr. Thomas and the other gentleman?

4    A    Yes.

5    Q    Okay.  And you write here, "I learned on August

6    13th a less qualified male was selected and one of the

7    two positions was not filled."

8    A    Yes.

9    Q    You wrote that; correct?

10   A    Yes.

11   Q    And again, you are referring to --

12              MR. KEES:  Did you say something,

13         Austin?  I'm sorry.

14              MR. PORTER:  No, I'm sorry.  I coughed.

15   BY MR. KEES:

16   Q    You are referring to Dave Thomas as the less

17   qualified male; correct?

18   A    Yes.

19   Q    Now, I will come back to that.  But let me finish

20   up this narrative.  "I filed a sexual harassment

21   charge against my former supervisor that was resolved

22   in June of 2018."  You are referring to your charge

23   against Bennie Bowers; correct?

24   A    Yes.

25   Q    And you write, "My new supervisor mocked my

Page 63

1   fault.

2   A   Okay.

3   Q   Now, prior to him becoming your supervisor as the

4   facilitator, had he supervised you in his capacity as

5   captain when you were administrative sergeant?

6   A   No, he did not.  The director was over me.  I did

7   not, on the job -- on my job duty, the job

8   description, it was that I answered to -- my

9   supervisor was the director.

10  Q   Prior to Mr. Bowers resigning, had the district

11  ever put in place a mechanism where you were not to

12  report to Mr. Bowers?

13  A   No.  If so, it was -- I'm going to say "no".  No,

14  it was not.

15  Q   And I'm asking, also, informally, meaning any

16  times that you met with Doctor Warren or Paul Brewer

17  regarding issues with Bennie Bowers, did they

18  immediately put in some type of procedure where you

19  were not to have to report to him?

20  A   And I can answer that for you.  My answer to that

21  is, that's why I went forward with the EEOC.  Mr.

22  Brewer told me, until it was investigated, until he

23  determined what was or what was not, I did have to

24  still work up under Mr. Bowers, and if I wanted my

25  position, I would have to report to my office along

Page 64

1    with Mr. Bowers.

2    Q    Okay.  And that was when you made your grievance

3    in March with the district in '18?

4    A    Yes, sir.

5    Q    And then, you filed your EEOC charge in April 3rd

6    of 2018; right?

7    A    Yes, sir.

8    Q    Okay.  So, prior to Mr. Bowers resigning, nothing

9    ever formal in the way of a document was given to you

10   regarding changing of reporting or changing of your

11   direct report?

12   A    No, sir.

13   Q    Okay.  What building did you serve in as

14   administrative sergeant?

15   A    In the warehouse building -- in the security

16   office building, actually.

17   Q    Is that where Bennie Bowers' office was located?

18   A    Yes.

19   Q    And when it was announced -- I believe you

20   testified to this earlier, I just want to make sure I

21   understand.  When it was announced in a department

22   meeting that Dave Thomas had been given the

23   facilitator's position by Curtis Johnson, i.e., Curtis

24   Johnson made the announcement, that's the first time

25   you had heard of it?

1   it was always stated in the meetings that the reason

2   why Bennie Bowers had the position was because of Dave

3   Thomas putting in a word for him for Derek Scott to

4   hire him.

5   Q    Okay.

6   A    And so, that was, you know, in our forthcoming

7   meeting with the supervisors and all.  So, it was kind

8   of like you knew where you treaded in meetings.  If

9   something was brought up and if you go against what

10  Dave said, Bennie Bowers was going to get you.  If you

11  go against Bennie Bowers, then, you know, Dave Thomas,

12  you are going to have some issues with that.

13  Q    Okay.  And so, Dave Thomas becomes your

14  supervisor in August of 2018.  And you work in that

15  role underneath him until you resign in January of

16  '20?

17  A    Yes.

18  Q    Okay.  And ultimately, what was the reason for

19  your resignation in January of '20?  I know we read

20  your resignation letter, but I want to know everything

21  that played into you resigning January of '20.

22  A    It was due to the last injury that I had, I could

23  not -- they could not hold my position any longer due

24  to the parent injuring my arm at Sylvan Hills on that

25  March 8th or 9th date.

Page 67

1    Q    March 8th or 9th, '19; right?

2    A    Yes, yes.

3    Q    So, that re-injury on March -- let me get the

4    exact date.  March of 2019 when you were re-injured,

5    did you have another surgery?

6    A    No.

7    Q    You did have a surgery the first time, did you

8    not?

9    A    Yes, I did.

10   Q    Okay.

11   A    Yes.  I didn't have a second surgery.  I had

12   injections after that.

13   Q    Okay.

14   A    I had the surgery -- I only had one surgery.

15                    (WHEREUPON, there was a telephone

16             interruption.)

17                    THE WITNESS:  I'm sorry.

18   BY MR. KEES:

19   Q    No, you are fine.  Now, this isn't relevant, I'm

20   just curious.  Did the Workers Comp ever raise the

21   issue of the assault of a classified employee being

22   paid for a year?  Do you know anything about that?

23   A    I do not.

24   Q    Because you were assaulted by a parent of a

25   student?

1   A    Yes.  I was assaulted by -- I will be forthcoming

2   telling you I was assaulted by a parent at Sylvan

3   Hills Middle.  On that particular morning, prior to

4   that, Doctor Warren -- they had a problem at Sylvan

5   Hills Middle with kids being bullied.  And again, as I

6   told you, I had done all the seminars and trainings,

7   that's with the students and with principals and

8   teachers.  So, Doctor Warren had specifically asked

9   for me to go over to Sylvan Hills and spend some weeks

10   over there until I finished getting these seventh,

11   eighth, and ninth graders all in in doing a seminar

12   training on bullying.  On this particular morning, a

13   parent came in, very abruptly, cussing, and ran

14   through the back of the office where he was not

15   supposed to be, saying what he was going to do, using

16   explicit words, to fight the principal.  I said, "Sir,

17   you can't do this."  And as a result of that, he took

18   me and threw me over his back and re-injured the same

19   arm.

20   Q   He threw you over his back?

21   A    Yes.  He threw me over to get to the principal,

22   if you follow what I'm saying.

23   Q   Right.

24   A    And as a result, you know, by the time I came

25   around, I had hit the wall -- you know, hit the floor

1   and the wall.  And after I got up and all, and, you

2   know, again, the principal had ran to his office.  As

3   a result of all of that, I think the parent was

4   arrested.  But after that, I never knew anything else

5   about it after that.  Okay?

6   Q    Okay.  So, did you have ongoing issues that --

7   health impairment issues after March of '19 until your

8   resignation?

9   A    Yes.  And still do to this day, yes.

10  Q    So, like I can't see you, but you said you

11  couldn't raise your right arm earlier.  Are you still

12  in an arm sling or something?

13  A    No.  My arm -- CRPS, I don't know if you -- you

14  are probably not really familiar with CRPS, Complex

15  Regional Pain Syndrome.  But also, others refer to it

16  as RSV.  And so, what it is, is I don't have any

17  control of that.  My arm swells, it gets hot, it gets

18  cold, and I don't have any limitation -- I mean, I

19  can't do anything with my arm.

20  Q    So, your right arm, you can't use it?

21  A    Right.  I cannot use my right arm.

22  Q    Okay.  And I think you told me that you can't

23  type because you had people typing for you?

24  A    Right.

25  Q    Okay.

1    A    I can't sign my name or any of that.  You know,

2    I'm not a lefty.  I'm right-handed.

3    Q    Okay.

4              MR. KEES:  I kind of want to take a

5         break, and also I wanted to clarify some

6         things that might help my questioning.

7         Austin, can I call you?

8              MR. PORTER:  Yes.

9              MR. KEES:  That may speed things up.

10        Let's take a break.  I will give you a call.

11             MR. PORTER:  You've got my cell number?

12             MR. KEES:  I think I should.

13             MR. PORTER:  Yes.  Okay.

14             MR. KEES:  Hold on, Austin.

15             (WHEREUPON, a break was taken.)

16   BY MR. KEES:

17   Q    I want to focus in on the August time frame when

18   you were -- you and all your other colleagues were

19   informed that Mr. Thomas had been named the

20   facilitator.  How many people in the department as of,

21   you know, August 2018 reported directly to Mr. Thomas?

22   A    Let's see.  I think maybe about 50.  I'm just

23   guesstimating.

24   Q    And it was just him, the buck stopped with him, I

25   think?

1  A     Yes, yes.

2  Q     And you have discussed in your charge some of the

3  issues, comments he made.  He mocked your on-the-job

4  injury in September --

5  A     Yes.

6  Q     -- on different days.  Tell me a little bit more

7  about that.

8  A     He would make statements about my arm.  Like I

9  put in there that he stated about he wanted to move my

10 desk so that he could watch me move my arm.  It was

11 also times -- just bear with me.  He would look at my

12 arm -- anybody could tell that it was swollen, and I

13 don't have any control of that.  And he would say,

14 "Don't you really think you need to do something

15 about" -- "How are you going to work here with your

16 arm?  If you are going to work for me, you are going

17 to have to get the job done."  And, you know, I was

18 just, "Look" -- and then, other times, simple things

19 as going to take clothes or to pick up clothes, "Well,

20 you know, you are unable to do anything.  I don't know

21 why you are here," and he would laugh at different

22 things about just statements in general, which I

23 didn't think they were funny at all.

24 Q     Now, prior to that second injury in March of

25 2018, were you still -- like let's say the day before

1  you were re-injured, were you still limited -- did you

2  have work limitations?  And again, I'm talking about

3  -- like go to the week before your re-injury, did you

4  have work limitations?

5  A    Yes, sir.  The thing was, my work limitations

6  were never -- I was told I was on light duty with

7  Bennie Bowers.  I never received any duty limitations,

8  but I was always told that I was on light duty, if I'm

9  making sense to you.  I never received paper from Dave

10 Thomas saying that, "Here is my duties as light duty."

11 My question that I asked to Mr. Thomas was with Sandra

12 Arnold, because, just as Mr. Bowers had stated prior

13 to when I got injured that Sandra -- he would give my

14 position to Sandra Arnold, Mr. Thomas was basically

15 doing the same thing.  If you say be more specific, I

16 would tell you that just as the instance of PSO, when

17 I told you he had for me to type the information, and

18 it didn't have to be typed.  And so, I was there

19 trying to do that.  And then, he would say, "Well, I

20 need you to go over and relieve the desk at central

21 office."  And I said, "Well, isn't that what Sandra is

22 supposed to be doing?"  And I said, "Because she is a

23 security officer, you know, why are you having me go

24 and do that?"  He said, "Well, because that's what I

25 need you to do."  I said, "Well, in my job duties, I

1   don't know exactly what I'm supposed to be doing."  I

2   said, "You have payroll, you don't allow me to do

3   that.  I don't know" -- and he said, "Well, if you are

4   going to work for me, you are going to do what I say

5   you do."  So, I did it.  I tried to.

6   Q    And that was starting -- are we talking pre or

7   post your second injury?

8   A    We are talking pre -- after my second injury, I

9   did not -- I was unable to return.  I never returned

10  after my second injury.

11  Q    Oh, you never returned after your March injury?

12  A    No, I never returned.

13  Q    Okay.  So, you were getting -- was Workers Comp

14  giving you like, what is it called, temporary

15  disability benefits?

16  A    No.  I didn't receive anything.  Workers Comp

17  didn't pay me anything on it, because it was that they

18  had to prove that it was -- that I had actually

19  re-injured or something.  I didn't receive any income.

20  Q    Okay.

21  A    I was not receiving anything.

22  Q    Okay.  So, when you -- so, I didn't realize that.

23  You were off of work from March of '18 -- no, excuse

24  me, excuse me.  You were off from March of '19 until

25  your resignation?

1    Q    Oh, sure.

2    A    -- was unfactual, not true.  I can tell you, on

3    September 5th, it was -- again, it was about me typing

4    the information up that I was trying to do.  I got --

5    I got yelled at because I said that they did not have

6    to be typed.  And if you even see an example at State

7    Police to this day, it says on there that it could be

8    handwritten or typed.  And that it is supposed to come

9    from the actual security officers.  And, you know,

10   that was something that he did not like.  I was the

11   person initially who was actually over doing that,

12   actually, you know, having the officers certified.

13   Q    Okay.  But you had complaints against Bowers that

14   were sexual in nature, but that's not the case with

15   Mr. Thomas?

16   A    No, it was not sexual.

17   Q    Okay.  Was he -- he was your supervisor.  Did you

18   have any interactions in that time period of August to

19   March with Curtis Johnson?

20   A    Yes, I did have interactions, yes.

21   Q    What were the basis of those interactions?

22   A    Well, initially -- initially, when he first got

23   -- when Mr. Johnson got hired on, I shared the thing

24   about -- because I didn't know what was going on, I

25   shared a thing about not being able to -- I got a

1    phone call at Sylvan Hills High School to take an

2    individual that they believed was on meth.  I was

3    trying to go and drug test that individual, and I was

4    at the office, and I didn't have keys to drive the

5    company car.  Out of four different vehicles, I was

6    retaliated, I was sabotaged against, because they

7    wouldn't -- I couldn't do my job.  So, I told Mr.

8    Johnson about it, and he said, well, he had a key to

9    the SUV and all.  And he said, "Well, you know,

10   reschedule it."  And so, I, you know, did that.  And I

11   let him know how important it is as a DR to follow up

12   when you have someone around kids doing drugs.  So,

13   that was one interaction.  Mr. Johnson would also say

14   about my arm, "I see your arm is swollen.  What are

15   you going to do about that?"  You know, and I said,

16   "Hey, I'm in pain," I said, "but I'm trying."  There

17   were other cases in reference to, I had hired a temp

18   worker, and Mr. Johnson -- I had did a wrong thing by

19   Mr. Johnson, because I didn't know I wasn't supposed

20   to hire her because Mr. Johnson knew her outside of

21   PCSSD.  And so, I didn't know that.  So, that's a

22   couple of things that happened.

23   Q    Can you hear me?

24   A    Yes.

25   Q    The hiring -- how were you able to hire?  I

1   didn't know you had the authority.  What do you mean

2   by that?

3   A    So, when I was telling you initially, back in

4   June when the positions were RIFed and I said I was

5   sitting in the role, Mr. Brewer told me to sit in that

6   role, but I wasn't getting compensated for it, gas or

7   the pay as two other employees, Marwin Edwards did and

8   Sandra Arnold did.  I had to take that responsibility,

9   because I did have that, as hiring temps at any time.

10  That was with Mr. Bowers and as an administrative

11  sergeant initially.  Okay?  And so, sitting under the

12  administrative sergeant role, I was still able to hire

13  temp workers at that particular time.  As the school

14  year was gearing up, I had to have workers, I had to

15  have temps for our schools.  And so, we -- of course,

16  Kim White, we ran it in HR, ran the positions as

17  usual, and I sent e-mails to Mr. Brewer that he didn't

18  respond to.  He did respond to the e-mails, but when

19  he had me come over to central office, he okayed, you

20  know, these things for me to do.  So, I hired temp

21  workers.

22  Q    Okay.  And then, there was a particular

23  individual female that you hired that Mr. Johnson

24  opposed?

25  A    Yes.

Page 79

1    Q    Who was that?

2    A    Her name was Jacqueline Matthews.  She had --

3    Q    Go ahead, go ahead.

4    A    I was about to say, she had applied.  Her resume

5    and her application was great.  She had the background

6    for what I needed.  And it was not just me.  What we

7    actually do is, you know, the system kicks out who is

8    qualified and who is not qualified.  And so, I take

9    the people from there and interview them.  And it was

10   myself and a Regina, she is over nutritional services,

11   that Mr. Brewer told me to utilize to help me in that

12   process.

13   Q    Okay.

14   A    And so, that's what we did.

15   Q    And when you talk about being in the temporary,

16   or interim role, are you referring to the time period

17   -- well, you tell me.  What time period are you

18   referring to?

19   A    I'm referring to the time period of approximately

20   like June -- June to August, until they named Dave in

21   the position.

22   Q    Okay.  So, because Bennie Bowers resigned

23   sometime in the spring, but you still had the two

24   captain positions; right?

25   A    Right.

1    of our security vehicles.

2    Q    Okay.  So, you don't know what his set-up was --

3    A    No.

4    Q    -- aside from he was there on some type of paid

5    basis?

6    A    That's all I knew.  And I could tell you that I

7    had to clock in.  On the payroll information, he never

8    clocked in.

9    Q    Okay.

10   A    So, I don't know what that was.

11   Q    And that was never explained to you by anyone?

12   A    No, sir.  No, sir.

13   Q    Okay.

14   A    And if you look at -- well, I mean, I even -- I

15   sent letters to Mr. Brewer, because I didn't know what

16   to do.  You know, all I was trying to do was what he

17   asked me to do, and that was run the department until

18   we got the positions done and all.  I never knew any

19   different.

20   Q    And Mr. Brewer was not on that interview

21   committee?

22   A    No, he was not.

23   Q    Okay.  Did you think your interview went well?

24   A    Yes, I did.  I thought it went well, because the

25   questions that they asked about training and all, I

1    was the one who had done those positions.  Do I feel

2    that I was probably marked lower, probably so.  I was

3    the one who gave the test to the officers to even --

4    well, let me go back.  I made the test up for the

5    officers to take to actually get licensed through

6    State Police.  Okay?  And so, secondly, the questions

7    that they asked -- basically, I remember screwing up

8    on one question.  And that's to be totally honest with

9    you.  Other than that, I thought I did quite well.

10   But I never got a score or anything.  You know, that's

11   the only thing I heard was, on the 30th, that Dave

12   Thomas had the position.

13   Q    Okay.  And then, that prompted you to file the

14   second EEOC charge?

15   A    Yes.

16   Q    And then, were you contacted about the mediation

17   on the second EEOC charge?

18   A    Yes, I was.

19   Q    And did you choose not to?

20   A    I did.

21   Q    Why was that?

22   A    I had -- I felt like I had been so humiliated and

23   just embarrassed in the shape of everything.  And it

24   was -- I really just didn't know what to do.  Because

25   I felt like the first time, you know, the promises

1   that were, you know, going to be -- I still had to

2   deal with the same individuals, and I didn't, you

3   know, feel that any of that was changing again.

4   Q    Did you get any feedback following your interview

5   from anyone?

6   A    No, sir, I didn't.

7   Q    Okay.

8   A    And I wasn't the only one.  During the meeting

9   that he announced of Mr. Thomas getting it, Gary

10  Burton was in the meeting, Lonnie Murphy, those same

11  guys that I was referencing, they asked him the same

12  thing, "Well, who made the decision and why did we not

13  get a letter," "What did we make," you know, "Who said

14  it was just one, and how did he receive it when his

15  position was RIFed?"  So, Curtis ended it by saying

16  that he was the one who got the position.

17  Q    Okay.  And again, you said you thought the

18  interview went well aside from one question that you

19  didn't think you did well on?

20  A    That is correct.

21  Q    What was that one question?

22  A    That one question referenced the avoid, deny,

23  defend.  And if I remember correctly, I did not put

24  the steps in order correctly, basically.

25  Q    What was the question, again?

1   A    I believe it was about -- I'm assuming, I think

2   it was about avoid, deny, defend.  And I could be

3   wrong.  But I think, if I can remember correctly, if

4   you say, you know, "What would I go back and do over,"

5   I would say the question that I kind of remember was

6   that one.

7   Q    Yes.  And I'm just not sure I'm catching that

8   term.  Avoid?

9   A    Yes.  It's about a terroristic threat situation,

10  is what it was.

11  Q    But what are you saying?

12            MR. PORTER:  You said "avoid, deny"

13        what?

14            THE WITNESS:  Avoid, deny, defend.

15            MR. PORTER:  Avoid, deny?

16            THE WITNESS:  Avoid, deny, defend, yes.

17        ADD, avoid, deny, defend.

18  BY MR. KEES:

19  Q    Got it.  Okay.

20  A    Okay.  And it may not have been even -- you know,

21  it's just what I feel like that I screwed up on.  I

22  don't know.  I never got anything about it.

23  Q    Did they ask you any questions about your Workers

24  Comp injury?

25  A    I don't recall.

1        MR. PORTER:  Are you referring to the

2        re-injury that occurred?

3   BY MR. KEES:

4   Q    Yes.  The re-injury.

5   A    Not at the time of the re-injury.

6   Q    Ronald Bentley, who is he?

7   A    He is one of the supervisors of the schools.  He

8   handles the Maumelle side, if that makes sense.  That

9   part of the river.

10  Q    Okay.

11  A    It was sectioned out.  You had asked earlier, and

12  I said that we had four supervisors.  He was one of

13  the four.

14  Q    Okay.  He was a supervisor.  And what about Jeff

15  Bradford?

16  A    Jeff Bradford was a security officer.  And the

17  thing with that was, Jeff Bradford had sent me an

18  e-mail, or given me a letter, regarding that he had a

19  disability, that he had two service injury

20  disabilities, and that rather than me place him at a

21  junior high school that I had him at, he wanted to be

22  placed at an elementary school so he could not have to

23  do -- not have to deal with the kids as much, but

24  younger children.  I gave that to Mr. Brewer, I gave

25  it to Mr. Johnson, and I gave it to Dave.  He got the

1    preferences that he wanted.  He got moved to an

2    elementary school, you know, to compensate for his

3    injuries.

4    Q    So, what are you saying, though?  How does that

5    compare to you?  Help me understand the correlation.

6    A    What I'm saying is, they did make accommodations

7    for him to work.  They didn't give him a hard time.

8    He didn't mock him about his disability.

9    Q    Oh, okay.

10   A    But he did mock me about mine.

11   Q    Okay.  Who is Camilla Jenkins?

12   A    Camilla Jenkins is the security officer at the

13   front desk.  She is the one I referenced.  She would

14   give detail about even Mr. Brewer saying that me with

15   my arm, you know, well, my arm is messed up, anyway,

16   and him saying about I wouldn't be over anyone,

17   supervising anyone.  She, too, has been harassed,

18   along with others, with Mr. Thomas, I would say.

19   Q    And when you got your re-injury, you were at

20   Maumelle?

21   A    No.  I was at Sylvan Hills Middle.

22   Q    Okay.  And what took you there as an

23   administrative sergeant?

24   A    I was sharing with you that Doctor Warren asked

25   specifically for me to go over and do training with

1    the seventh, eighth, and ninth graders on bullying,

2    because bullying was really, really bad.  And I was

3    the one who would do the seminar training, I did it

4    with parents and their kids.  So, she specifically

5    requested me to go over and handle the situation over

6    there.

7    Q    That was just something you were good at doing?

8    A    Yes, sir.

9    Q    Okay.  Did Mr. Thomas go over?

10   A    No.  She asked for me.  That's what I was trying

11   to explain to you earlier.  I was the one who did the

12   training.  I did the seminars and speaking engagements

13   to principals, to teachers, and to students.

14   Q    Okay.  Is that something that the facilitator can

15   do if they had that strong suit?

16   A    Yes, sir.  Yes, sir.

17   Q    Okay.  I mean, if you had been the facilitator,

18   could you still have gone and done that training for

19   Doctor Warren?

20   A    Yes.  I still could have done it, yes.

21   Q    Okay.  And who is Jacqueline Matthews?

22   A    Jacqueline Matthews is the lady that I stated

23   that I had hired as a temporary worker that Mr.

24   Johnson had Sandra Arnold call and say that, you know,

25   she couldn't be hired.  And I had already hired her.

1   And when I asked Mr. Johnson about it, he said he

2   didn't believe that she would be a good fit.  It was

3   myself and Lonnie Murphy there.

4   Q    Okay.

5            MR. KEES:  Okay, ma'am.  I think that's

6        all the questions I have.  Thank you for your

7        time and attention today.  Okay?

8            THE WITNESS:  Thank you.  Thank you,

9        guys.

10           MR. PORTER:  I have no questions.  Thank

11       you.

12           MR. KEES:  Thank you.  Take care,

13       everybody.  Stay safe.

14           (WHEREUPON, at 3:52 p.m., the taking of

15       the above-entitled deposition was concluded.)

16                       ---o---

17

18

19

20

21

22

23

24

25

000043







000039

*Change #*
*Card ?*

FROM: David E. Thomas
         Safety and Security Facilitator

January 23, 2019

SUBJECT: Letter of Counseling

TO: Wanda Grigsby
        Administrative Sergeant

On September 5, 2018, you left work early, informing Officer Arnold that you were not feeling well. On September 14, 2018, you left work early, again informing Officer Arnold that you were not feeling well. On September 17, 2018, at approximately 5:41am, you called Officer Arnold and asked her to let me know that you wouldn't be in this week and that you're under a doctor's care. On January 15, 2019, you left the office at approximately 10:45am and never returned to work the rest of the day. When I spoke with you on the following day, you stated that you went to Allied Security and State Police to obtain transfer papers for one of our officers and to Cruz to check on uniform pants. None of this was done with prior approval from me.

Department policy is that you notify your immediate supervisor of any pending absence from work. Your immediate supervisor is the Facilitator. You have failed to follow proper protocol in each of the above instances.

This letter is to counsel you on your responsibility to ensure that you notify your supervisor of your pending absence in a timely manner and to remind you that any absence of more than five (5) consecutive days will require a physician's statement. Any future acts of this nature could result in disciplinary action.

You will acknowledge receipt of this letter by signing below and a copy will be maintained in your personnel folder.

*David E. Thomas*
David E. Thomas
Safety and Security Facilitator

I acknowledge receipt of this letter.

Wanda Grigsby
Administrative Sergeant, Safety and Security


PLAINTIFF'S EXHIBIT
C

000039



000051

Revised 6.18

Change #9 and #10

# PULASKI COUNTY SPECIAL SCHOOL DISTRICT
## CLASSIFIED EMPLOYEE EVALUATION FORM

| | |
|---|---|
| **Employee Name:** Wanda Grigsby | **Date:** 2-27-19    **Reason for Review:** ⊙ Annual |
| **Location/Department:** Safety & Security Department | **Title:** Administrative Sergeant    ○ Other |
| | **Addendum Attached** ✓ |

### EVALUATION RATING DEFINITIONS

**Unsatisfactory:** Minimal or no evidence of employee performing the duties at an acceptable level. Performance is clearly inadequate. Immediate corrective measures are required.

**Area for Growth:** Some evidence of employee performing duties at an acceptable level. Some performance is inadequate. Corrective measures may be needed.

**Satisfactory:** Employee performs duties adequately and effectively. Evidence of meeting expectations.

**Exceptional:** Employee exceeds performance standards. Evidence of exceeding expectations.

**Not Applicable:** Indicator does not apply to employee's position.

| Please select one rating for every indicator. An explanation for each rating of "Area for Growth" or "Unsatisfactory" is required. Attach additional documentation if necessary. | Unsatisfactory | Area for Growth | Satisfactory | Exceptional | Not Applicable |
|---|---|---|---|---|---|
| **Quality of Work:** Work is accurate, thorough, neat, and completed in a timely manner. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Remarks: | | | | | |
| **Quantity of Work:** Effectively and efficiently produces work in accordance with job description and the district, department, and building needs. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Remarks: *In relation to primary Job Description.* | | | | | |
| **Job Knowledge:** Demonstrates knowledge of job duties and their purpose. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Remarks: *In relation to primary Job. description.* | | | | | |
| **Job Skill:** Demonstrates skill in job performance, requiring minimal direction or supervision. | ☐ | ☒ | ☐ | ☐ | ☐ |
| Remarks: *In relation to primary Job. description* | | | | | |
| **Flexibility and Adaptability:** Learns new tasks and assignments willingly. Handles situations appropriately, in a timely manner, even under stress. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Remarks: | | | | | |
| **Initiative, Judgement, and Decision-Making:** Seeks new or additional assignments. Involved in solving problems and offers constructive solutions. Uses good judgement and makes appropriate decisions. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Remarks: | | | | | |
| **Care and Operation of Equipment:** Properly maintains and operates equipment. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Remarks: | | | | | |
| **Safety:** Follows safety guidelines. Maintains and promotes a safe work environment. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Remarks: | | | | | |

**PLAINTIFF'S EXHIBIT**
tabbies
D-1

| Please select one rating for every indicator. Write an explanation for each rating of "Area for Growth" or "Unsatisfactory." Attach additional documentation if necessary. | Unsatisfactory | Area for Growth | Satisfactory | Exceptional | Not Applicable |
|---|---|---|---|---|---|
| **Compliance:** Has adequate knowledge of and adheres to district, department, and building policies and regulations, including appropriate recordkeeping and documentation. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Remarks: | | | | | |
| **Relationships, Communication, and Professionalism:** Develops and maintains effective working relationships. Represents district and school board values in communication and professionalism with all stake-holders. Appearance and attire is appropriate for the work. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Remarks: | | | | | |
| **Attendance:** Attends work as scheduled. Complies with district, department, and building processes and procedures regarding the use of leave. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Remarks: | | | | | |
| **Punctuality:** Arrives for work and work appointments on time. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Remarks: | | | | | |

**Major Strengths and Accomplishments:**

**Goal(s) to Achieve During Next Evaluation Period:**

Obtain the kowledge base and skills as outlined in assigned job-description.

**SIGNATURES**

Name of Evaluator (Printed): DAVID E. Thomas          Evaluator's Title: SAFety + Security FACiLitator

Evaluator's Signature: David E. Thomas          Signature of Principal or Department Head: _____

*I understand that my signature signifies I have read the evaluation. It does not indicate agreement with its content. I understand that I have the right to respond in writing and my comments will be attached to the form in my personnel file.*

Name of Employee (Printed): _____

Employee Signature: _____          Date: _____

Make two copies: One for the employee and one for the supervisor/evaluator.

*Send original to Human Resources to be placed in the employee's personnel file.*

000053



**PULASKI COUNTY SPECIAL SCHOOL DISTRICT**
Department of Safety and Security
David E. Thomas, Facilitator
1101 B. East Dixon Road, Little Rock, AR 72206

Date    March 1, 2019

To:     Curtis Johnson, Director of Operations

From:   David E. Thomas, Safety and Security Facilitator

Re:     Annual Employee Evaluation, Wanda Grigsby, Administrative Sergeant

I counseled with Officer Grigsby on February 27, 2019, and, after reviewing her evaluation sheet, she stated that she did not agree with her employee rating in three areas (Quantity of Work, Job Knowledge and Job Skill). I explained to Officer Grigsby that those were rated as Areas of Growth because she is currently not performing those duties, in relation to her primary job description. She contended that they should be rated as "Not Applicable" and refused to sign the evaluation. I showed Officer Grigsby the statement above the employee signature block which reads: **"I understand that my signature signifies I have read the evaluation. It does not indicate agreement with it's content. I understand that I have the right to respond in writing and my comments will be attached to the form in my personnel file."** She still refused to sign.

Attached is a copy of Officer Grigsby's job classification; on which I based her employee ratings. The areas highlighted are those that are currently NOT being performed.

David E. Thomas, Facilitator                                    Attachments: 1 Job Classification sheet





GRIGSBY, WANDA <wgrigsby2768@pcssd.org>

---

## Reasonable Accomodation Request

1 message

---

**BRADFORD, Jeffery** <jbradford@pcssd.org>                                          Sat, Aug 25, 2018 at 8:38 PM
To: wgrigsby2768@pcssd.org

Sgt. Grisby,
Due to one or more of my service connected disabilities I would like to request the following reasonable accomodation in order to continue working: reassignment to Lawson Elementary, Baker Elementary or another elementary school within the Pulaski Country Special School District. Thank you.
Officer Bradford



PLAINTIFF'S EXHIBIT
E

493-2019-00506                                    000038